IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEBRASKA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | 4:04 CR 3098 |
| | ) | |
| v. | ) | |
| | ) | |
| | ) | |
| DEBRA STEPHENSON, | ) | REPORT, RECOMMENDATION |
| | ) | AND ORDER |
| Defendant. | ) | |

Defendant has filed a motion to suppress statements made on May 6, 2004 and an amended motion to suppress statements made on December 3, 2003, on the bases that the statements were not voluntarily made. These motions were combined and heard by me on February 24, 2005 and March 10, 2005. At the conclusion of the hearing I took the motions under advisement, and now make the recommendation that both motions be denied in all respects.

Defendant was the sole employee of "Red-D-Cash," a check-cashing business in Nebraska City, Nebraska, owned by Joni Petersen. Defendant worked at the store approximately 35-38 hours per week, and when she was there, she was usually the only person present other than customers. Her sixteen-year-old daughter, Brittany Osborne, visited her mother occasionally at the store, and defendant allowed her into the "cage," the secured, employee-only area where cash was kept and records prepared and recorded by computer.

On December 1, 2003 Joni Petersen discovered that some money was missing from her business accounts. The next day, after she had first checked customer accounts and computer files and

discovered discrepancies, she discussed the matter with defendant. Defendant attempted to tell Petersen that sometimes when she was busy, she neglected to record some transactions, intending to do so at the end of the day, but forgot to do it. When Petersen did not believe the defendant's explanation, Petersen fired her and took her keys.

Later that day Petersen received a phone call from defendant in which defendant related that her daughter had been noticed to have "extra cash" lately, and that her daughter could have had access to the business's computer system at various times when defendant was absent visiting the restroom, and might have stolen some of the money. When again Petersen did not believe her, Petersen asked her to come in and explain it. Defendant said she would come into the office the next day around noon.

Petersen suspected that there was a loss of over $20,000, and decided to videotape the meeting. In addition, she telephoned the Otoe County Sheriff's Department to request that someone be dispatched to "be there" with her to observe the confrontation.

### The December 3, 2003 Statements

Approximately twenty minutes before noon on December 3, 2003 Deputy Otoe County Sheriff Lynn Lyon parked his marked cruiser in front of the Red-D-Cash store and entered. He discussed the losses and discrepancies with Petersen. Shortly after noon defendant arrived with her daughter, Brittany Osborne. Defendant stated that her daughter had something to say to Petersen. Thus started an approximately one-hour, videotaped conversation in which Brittany Osborne essentially admitted taking some money, and the defendant tried futilely to satisfactorily explain the remaining losses as

2

her lack of proper attention to record keeping.  Although the questioning was begun by Petersen, Lyon quickly took over the leading role, and essentially became an interrogator rather than an observer.  At the conclusion of the conversation both the defendant and her daughter left the store.

Defendant argues that the actions and comments of Deputy Lyon overbore the defendant's will to remain silent, thus making her statements involuntary and obtained in violation of the Fifth Amendment.  Defendant cites to places in the conversation in which the defendant is crying and distraught; Lyon uses "a demanding and demeaning tone"; Lyon used name-calling, referring to Brittany as a "thief," and to defendant as a "co-conspirator"; and Lyon implies that if defendant pays back the money, perhaps the complainant, Petersen, might not press for prosecution.  Defendant concludes from these items that she was subjected to "psychological coercion" resulting in her making inculpatory statements.

The May 6, 2004 Statements

Five months later the matter was being investigated as a possible mail fraud.  Having previously interviewed members of the defendant's household, FBI Special Agent James Krueger, accompanied by Deputy Otoe County Sheriffs Lynn Lyon and Mike Holland, arrived at the defendant's then place of employment, Heft Insurance Agency.  No notice had been given to the defendant; the officers entered unannounced.[1]  The time was shortly after 11:00 a.m.  None of the three was in uniform; however, all had badges or identification

---

[1] Special Agent Krueger testified that "She knew we were in town asking questions of people and her family."  There was no testimony, however, as to how that was so.

3

visible or shown to the defendant.  Krueger was armed but his weapon was not visible.

Deputy Lyon said to the defendant, "We'd like to ask you a few questions about what happened at Red-D-Cash," and asked her if this was a convenient time and place to do so.  He also suggested that if a better location were available, they could go there.  Defendant responded that it was all right to conduct the interview there at the business in an office adjacent to the reception area.  Lyon told the defendant she was not under arrest, and defendant said she had no objection, so long as the interview were conducted in the privacy of the adjacent office.

The defendant and the three law enforcement officers entered the office and started a recorded conversation.  The interview lasted approximately 3 ½ hours without any lunch break.  The only interruptions were once when the defendant's son came into the agency and stuck his head in the office briefly; once when the defendant's employer arrived and also entered for a few seconds; once when Deputy Lyon left to retrieve a folder in his car; and once when the defendant left the room to use the restroom, returning after two or three minutes.  During the interview the defendant never objected to the questioning, never requested to call an attorney, never requested a lunch break; and never refused to answer any questions.  Her demeanor was described as "calm," "talkative," "cooperative," "even" and "in control" of her emotions, and constant throughout the interview.  At the end of the interview the tape recorder was turned off, the officers left, and the defendant stayed at the office.

Defendant argues that her will to remain silent was overborne by the law enforcement officers, because (a) she was unrepresented at the interview; (b) she had no prior criminal history; (c) the

4

officers spoke to her in accusatory fashion;[2] (d) they implied she would "help herself" by explaining the discrepancies,[3] but did not advise her that making statements could hurt her; and (e) they treated her in a demeaning manner.[4]

## Discussion

Defendant concedes that she was not "in custody" when she was interviewed by law enforcement officers, and thus the strictures of Miranda v. Arizona, 384 U.S. 436 (1966), do not apply. Rather, the applicable standard is that established by Colorado v. Connelly, 479 U.S. 157 (1986). The court must determine whether, considering the totality of the circumstances, the defendant's will to remain silent was overborne by inappropriate overreaching conduct of law enforcement officers. U.S. v. Carroll, 207 F.3d 465, 472 (8th Cir. 2000). In evaluating voluntariness, I must engage in "a flexible consideration of the totality of the circumstances, including 'the

---

[2] Deputy Lyon said her actions were "the same as stealing." (p.147). Deputy Lyon accused her of turning away legitimate, regular customers to enable her to make false entries in the computer records and take the cash. (pp. 149-50). In addition, the officers said to defendant repeatedly that they didn't believe her; that her explanations didn't hold up; and that they knew she'd taken the money.

[3] Agent Krueger said to defendant, "What I'd like to do Deb, is, is to help yourself, because this is about the last chance you're gonna get." (p. 100).

[4] Agent Krueger commented, "You're possessive, aren't you?" (p. 111). Deputy Lyon made disparaging comments, such as, in response to defendant's question whether the officers "even looked" into her accounts, said, "Did we even look? What do you think we've been doing for the last four or five months?" (p. 115), and further, in response to defendant's mention of her daughter taking money when she was absent to the restroom, "...[Y]ou sure do take a whiz a lot." (p. 149).

5

specific tactics utilized by the police in eliciting the admissions, the details of the interrogation * * *, and the characteristics of the accused * * *' Rachlin v. United States, 723 F.2d 1373, 1377 (8th Cir.1983)(internal citations omitted)." U.S. v. Warbonnet 750 F.2d 698, 700 (8th Cir. 1984).  A defendant's statement "must not be...obtained by any direct or implied promises, however slight[.]" Brady v. United States, 397 U.S. 742, 753 (1970) (quoting Bram v. United States, 168 U.S. 532, 542-43 (1897)).

The fact that the government encouraged defendant to cooperate does not itself establish the kind of coercive police activity that renders a confession involuntary.  See U.S. v. McCaster, 193 F.3d 930, 934  (8th Cir. 1999)(Officers allowed defendant to remain at home rather than booking him), citing Connelly.  Tactics such as these will not render a confession involuntary unless the overall impact of the interrogation caused the defendant's will to be overborne.  See Jenner v. Smith, 982 F.2d 329, 334 (8th Cir. 1993).

I have carefully reviewed the video recording of the defendant's statements of December 3, 2003 as well as both the transcript and the audio recording of the statements taken on May 6, 2004. Several things are apparent. First, defendant's presence at and participation in both interviews were entirely voluntary; she initiated the first interview; agreed to the second interview; and was not arrested at any time.  Second, defendant was not emotionally distraught at any time; her demeanor shown on the videotape depicts one feigning despair, and on the audio recording, a consistent tone of voice unhampered by emotions.  Third, although defendant obviously attempts to deflect blame for the missing money to her daughter and her own negligence, she does make self-incriminating statements in the midst of her protestations of innocence.

Indeed, as argued by the government, it is difficult to conclude that her "will" was overborne in any sense at all in either of the interviews. Although she did acknowledge taking some actions from which guilt could easily be inferred, she never actually admitted committing any crime. Rather, her statements resulted from her effort to "accept responsibility" for the losses (caused by her daughter's stealing and her own negligence) without admitting guilt, a strategy undertaken of her own volition by concocting a transparent story. The story did not sway her interrogators. In fact, the more they told her that her statements were contradicted by all the business's records, bank records of her and her children's accounts, other corroborating evidence, and common sense, the more she spoke. The more they told her they didn't believe her, the more eager she was to speak more.

In short, there is no evidence of any "police overreaching" in this case. The Fifth Amendment does not require polite interrogation, and there is no authority that police interrogators are required to caution a suspect not in custody that what she says may be used against her. It is true that the defendant was "alone" in the sense of being unrepresented, and also that she had no prior experience in police interrogations. Those facts, however, do not overcome the clear evidence that she was speaking of her own free will. Nor can it be gainsaid that her protestations of innocence were the product of unfair, coercive "reverse psychology" on the part of the officers. The evidence is clear that the officers, even though at times they were less than gentle, did not engage in any untoward tactics of interrogation to trick defendant into speaking her piece. In summary, I conclude from a preponderance of the evidence that the defendant's statements made on December 3, 2003 and on May 6, 2004 were all voluntarily given.

IT THEREFORE HEREBY IS RECOMMENDED to the Hon. Richard G. Kopf, United States District Judge, that the motion to suppress statements, filing 16, and the amended motion to suppress statements, filing 24, both be denied in all respects.

The parties are notified that failure to file an objection to this recommendation in accordance with applicable local rules may result in the waiver of the right to appeal findings of fact herein.

FURTHER, IT HEREBY IS ORDERED, Trial of this matter is set to commence on May 9, 2005 at 9:00 a.m. before the Hon. Richard G. Kopf for a duration of five trial days.

DATED March 23, 2005

BY THE COURT:

s/ *David L. Piester*
United States Magistrate Judge